**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DIVISION OF MARYLAND**

| | | |
|---|---|---|
| **MS. AMARACHI NWANKPAH** | : | **CASE NO.:** |
| **14003 Downdale Drive** | : | |
| **Laurel, MD 20707** | : | **JUDGE:** |
| | : | |
| **Plaintiff,** | : | |
| | : | **COMPLAINT FOR INJUNCTIVE** |
| **v.** | : | **RELIEF AND DAMAGES** |
| | : | |
| **ALEDADE, INC.** | : | **(Jury Demand Endorsed)** |
| **4550 Montgomery Avenue, #950N** | : | |
| **Bethesda, MD 20814** | : | |
| | : | |
| *Also Serve:* | : | |
| **ALEDADE, INC.** | : | |
| **c/o Capitol Corporate Services, Inc.** | : | |
| **3206 Tower Oaks Blvd., Suite 400** | : | |
| **Rockville, MD 20852** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

For her Complaint ("Complaint") against Defendant Aledade, Inc. ("Aledade" or "Company"), Plaintiff Amarachi Nwankpah ("Plaintiff" or "Dr. Nwankpah"), by and through counsel, states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Amarachi Nwankpah is an individual residing in Laurel, Maryland, located in Prince George County, and is a former employee of Aledade, Inc.

2.      Defendant Aledade, Inc. is a corporation that conduct business in and operates out of 4550 Montgomery Avenue, #950N, Bethesda, Maryland 20814 located in Montgomery County.

3.      Venue is proper in the Southern Division of the United States District Court for the District of Maryland pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred there.

4.      Jurisdiction is proper in the Southern Division of the United States District Court for the District of Maryland pursuant to 28 U.S.C. §1331 because this case presents Federal questions.

5.      The Southern Division of the United States District Court for the District of Maryland also has supplemental jurisdiction over the remaining claims in this Complaint pursuant to 28 U.S.C. §1367.

## FACTUAL ALLEGATIONS

6.      Aledade is one of the nation's largest networks of independent primary care organizations that serves more than 2,400 primary care practices and community health centers across 46 states, caring for nearly three (3) million patients per year.

7.      At all times during Plaintiff's employment, Defendant was Plaintiff's "employer" for the purposes of Maryland's Wage and Hour Law ("MWHL") and Maryland's Wage Payment and Collection Law ("MWPCL").  Throughout Plaintiff's employment, Defendant:

        a.      Had the power to hire, fire, suspend and otherwise discipline Plaintiff;

        b.      Had the power to supervise Plaintiff's work duties to ensure her work was of sufficient quality;

2

     c.      Set and controlled Plaintiff's work schedule or had the power to set and control Plaintiff's work schedule, and;

     d.      Set and determined or had the power to set and determine Plaintiff's rate and method of pay.

8.     On August 19, 2022, Aledade hired Dr. Nwankpah, an African American and member of a protected class, as one (1) of three (3) new Regional Medical Directors ("Regional Director").

9.     At all times relevant herein, Plaintiff was an employee of Defendant pursuant to the MWHL and MWPCL who served as a Regional Director until she was wrongfully terminated.

10.     Out of the three (3) new Regional Directors hired, Dr. Nwankpah was the only African American.  Based on the way Dr. Nwankpah was treated at her hiring and throughout her employment, it is apparent that her race was a motivating factor for the significantly different way she was treated compared to similarly situated employees outside of her protected class.

11.     As soon as Dr. Nwankpah's employment began, she was immediately forced to assume job responsibilities that far exceeded those of what she was told the job would entail at the time she accepted her employment.  Indeed, after she was hired, Dr. Nwankpah was put in charge of leading both the Mississippi and North Carolina markets despite being told at her interview that she would be leading only the North Carolina market.

12.     Notably, Dr. Nwankpah was the only Regional Director who was made responsible for overseeing two (2) markets at once, when in comparison, the two (2) Caucasian Regional Directors hired at the same time as her and other non-protected, similarly situated Regional Directors were assigned to oversee only one (1) market each with significantly less work for essentially the same pay.

13.     Aledade induced Dr. Nwankpah into accepting this significant change in responsibility by promising her that she would be entitled to receive two (2) additional bonuses - one for each market - if she continued her employment.  Aledade confirmed that each of those bonuses would fall within the $20,000 to $50,000 range and that Dr. Nwankpah would be entitled to their payout by the end of the first quarter of 2023 if she worked any part of 2022.

14.     Dr. Nwankpah relied on Aledade's explicit promises regarding these additional wages when she accepted this change in responsibility, especially  because her base salary did not change and she would be continued to be paid, upon information and belief, the same as her similarly situated comparators who were given significantly less responsibility.

15.     Despite the fact that Dr. Nwankpah was given significantly more work and responsibility than similarly situated employees not in her protected class, she received little to no guidance or onboarding compared to them.

16.     Dr. Lelin Chao (Asian), Dr. Nwankpah's supervisor who was supposed to be responsible for training her, made it clear to Dr. Nwankpah from the start that she had

no intention of helping her acclimate to her position.  Dr. Chao made next to no effort to onboard Dr. Nwankpah or to help her understand the significant needs of her markets - something that was being done for other similarly situated, non-protected Regional Directors.  Dr. Chao often left Dr. Nwankpah with the feeling that she could not bring any concerns to her without being reprimanded - again, treatment no other Regional Director experienced.  As a result, Dr. Nwankpah was basically left to train and supervise herself, doing everything she could to learn from other employees to be successful.

17.    The disproportionate amount of work and markets Aledade assigned to Dr. Nwankpah was a cause for immediate concern for her and other Aledade employees.  To be sure, it was well-known throughout the Company that the Mississippi market given to Dr. Nwankpah was one of the most difficult markets for Regional Directors to work with given its high turnover rate and other factors.

18.    In addition, the fact that Aledade also forced Dr. Nwankpah to oversee the North Carolina market in conjunction with Mississippi was a concern to Dr. Nwankpah and others who knew it would be extremely difficult for her or anyone else to handle both these markets simultaneously due to the need for significant onboarding and the mountain of work it would entail, especially for a new Regional Director.

19.    As an African American, Dr. Nwankpah also had concerns about working in the Mississippi market because of the State's well-known history of intense racial discrimination and persecution, which remains ongoing.  Dr. Nwankpah and other Aledade employees, including other leadership, voiced their concerns about Dr.

Nwankpah's assignment to upper management, but these legitimate concerns were always ignored.

20.     Nevertheless, Dr. Nwankpah was determined to succeed in her position and grow with the Company in face of repeated roadblocks that were not being put on her comparators.

21.     Dr. Nwankpah repeatedly asked Dr. Chao and Dr. Chao's supervisor, Dr. Jennifer Brull (Caucasian), for the level of support other Regional Directors were receiving, but her pleas were consistently ignored.

22.     Upon information and belief, Dr. Nwankpah is the only Regional Director who was given such little guidance from the Company in transitioning into a Regional Director role. Indeed, the only real tool Aledade gave Dr. Nwankpah was a 30-60-90-day plan generated by Dr. Brull that was created for Regional Directors in charge of only one (1) market, totally failing to take into account the work Dr. Nwankpah would have to perform to oversee the two (2) markets assigned to her. Dr. Chao even confirmed that this plan did not apply to Dr. Nwankpah based on her extensive workload, but, nevertheless, Dr. Nwankpah followed it successfully and completed its goals for both her markets.

23.     Despite proving herself a successful performer, Dr. Nwankpah was regularly subjected to unfair scrutiny by Dr. Chao in a manner that was completely inconsistent with the way her counterparts and other leaders in the Company were treated.

24.    For example, in November 2022, the Company hosted a retreat for all North Carolina market employees with Dr. Nwankpah being the only African American leader. Days before she was set to attend the retreat, Dr. Nwankpah became ill and consulted with Dr. Chao about her concern that she may be unable to attend in person. Dr. Chao instructed Dr. Nwankpah to take care of herself and made it clear that she should not attend the retreat if she felt worse. To Dr. Nwankpah's disappointment, she became even more sick and had to attend the retreat virtually, but made sure she was still connecting with her team in a meaningful way despite her condition.

25.    Notably, there were other leaders who also attended the retreat virtually - including a Caucasian employee with Dr. Nwankpah's same position. Upon information and belief, however, Dr. Nwankpah was the only employee who was subjected to unfair treatment for doing so, including, but not limited to, Dr. Chao questioning Dr. Nwankpah on her dedication to the Company for attending the retreat virtually.

26.    Dr. Nwankpah was completely taken back by Dr. Chao's unfair critique about her dedication to the Company because she was committed to her job and was always looking for ways to continue learning and growing in her position, on top of the fact that she had been following Dr. Chao's orders by attending the retreat virtually while she was sick. Upon information and belief, none of the similarly situated leaders who attended the retreat virtually were reprimanded or had their leadership questioned like Dr. Nwankpah.

27.     Throughout her employment, Dr. Nwankpah expressed her concerns about the discriminatory treatment she had been facing from Dr. Chao with other Company employees and leaders, who encouraged her to report her mistreatment to Joshua Swann, the Vice President of Diversity, Equity and Inclusion ("VP of DEI"). At their insistence, Dr. Nwankpah met with Mr. Swann in or around January 2023 for the first time and reported the unfair treatment she had been experiencing to him.  Mr. Swann told Dr. Nwankpah that he was not happy with Dr. Chao's conduct and suggested she contact Human Resources, but Dr. Nwankpah decided not to personally escalate her issues at that time out of fear of retaliation from Dr. Chao, hoping, without much confidence, that the unfair treatment would improve.

28.     As VP of DEI and a leader at the Company, Mr. Swann had a duty to escalate Dr. Nwankpah's reports to upper management, including Human Resources, but he failed to do so.  As a result, the Company did nothing to investigate or address Dr. Nwankpah's serious and ongoing concerns after she initially reported them, and her mistreatment continued.

29.     In December 2022, Dr. Nwankpah had her first performance review with Dr. Chao where she received great feedback and no criticism.   In fact, in early February 2022, Dr. Chao told Dr. Nwankpah that she was doing a "great job" with her performance and was "further along" than she expected after just five (5) months in her role.  However, it was not long before Dr. Chao's clear bias against Dr. Nwankpah was reignited and she continued her pattern of discrimination against her.

30.     In February 2022, Dr. Nwankpah, along with other employees, was asked to fill out an anonymous survey rating her experience with the Company.  Because the survey emphasized confidentiality and directly stated that the responses would not be shared with the reporting employee's manager, Dr. Nwankpah felt comfortable being open and honest about the issues she was experiencing with Dr. Chao.  Dr. Nwankpah specifically detailed the differential treatment and other issues she had been experiencing with Dr. Chao in this survey, but, despite the Company's promise that her responses would be kept strictly confidential, Dr. Nwankpah soon learned that her "anonymous" survey was in fact shared by Dr. Brull with Dr. Chao directly, which Dr. Chao admitted to Dr. Nwankpah.  Upon information and belief, no other employee's confidentiality was breached during this process, and Dr. Nwankpah was the only employee subjected to retaliation for her responses.

31.     Indeed, rather than make an effort to address or investigate the serious issues Dr. Nwankpah raised in this survey, the Company ignored Dr. Nwankpah's complaint and engaged in efforts to further the discriminatory treatment she was experiencing.

32.     For instance, Dr. Chao became increasingly hostile and retaliatory with Dr. Nwankpah after discovering the report she had made about her.  Among other things, Dr. Chao also began to unfairly criticize Dr. Nwankpah's performance for the very first time and began to cultivate a culture of disrespect towards Dr. Nwankpah with her direct reports.

33.    Soon after discovering Dr. Nwankpah's complaint, Dr. Chao privately met with Dr. Nwankpah's entire field team and subordinates – without any notice to Dr. Nwankpah – and solicited criticism of her performance and leadership behind her back. During that meeting, Dr. Chao rallied Dr. Nwankpah's team against her in an effort to create an even more hostile work environment for Dr. Nwankpah, which became progressively worse over the next two (2) months.

34.    Dr. Nwankpah experienced a notably negative change in her team's attitude after they met with Dr. Chao, who fostered an overall decrease in respect towards Dr. Nwankpah as a leader.  This included Dr. Nwankpah's subordinates copying Dr. Chao on all communications with Dr. Nwankpah, which Dr. Chao had apparently instructed them to start doing for reasons unknown to Dr. Nwankpah.  Dr. Nwankpah's subordinates also stopped referring to her as "Doctor Amara" and began addressing her by her first name alone, something they had never done prior to meeting with Dr. Chao. Upon information and belief, no other similarly situated leader outside of Dr. Nwankpah's protected class was treated this way by their team or supervisor.

35.    Nevertheless, Dr. Nwankpah remained committed to her position as a leader and made an effort to turn the tide with Dr. Chao despite the unlawful treatment she was consistently experiencing.  In an effort to do so, Dr. Nwankpah asked Dr. Chao for clear expectations and suggestions for ways to improve her overall performance, which had never been in question prior to her making her report in the "anonymous"

survey.  Dr. Chao offered no support for Dr. Nwankpah and continued to unfairly critique her instead in clear retaliation for her engagement in protected activity.

36.    On or around late February 2023/early March 2023, Dr. Nwankpah reported these ongoing issues to Mr. Swann once again, and he confirmed that she was not being treated the same as similarly situated employees outside her protected class at the Company.  He also told Dr. Nwankpah that he believed the way Dr. Chao had been treating her was inappropriate, and he again encouraged Dr. Nwankpah to meet with Human Resources to discuss these serious, racially motivated issues.  Like the first time Dr. Nwankpah reported her unlawful treatment, Mr. Swann ignored his obligation to escalate these concerns and no investigation was conducted.

37.    In early March 2023, Dr. Nwankpah contacted Human Resources and met with two (2) HR representatives - Lauren Simmers and Patricia Sias - to detail the discriminatory and retaliatory treatment she had been experiencing since the start of her employment. During this meeting, HR apologized to Dr. Nwankpah for her experience, acknowledged the wrongfulness of Dr. Chao's conduct and told her that no one should be treated the way she had been.

38.    HR also told Dr. Nwankpah that they wanted to hold a meeting with her, Dr. Chao and Dr. Brull in an effort to try to resolve the issues raised by Dr. Nwankpah and create a plan moving forward, but Dr. Nwankpah expressed deep concern that she would continue to be retaliated against if her renewed reports against Dr. Chao came to

her attention.  HR assured her that this would not happen, and Dr. Nwankpah agreed to attend the meeting based on these explicit representations.

39.    Soon after Dr. Nwankpah made her protected complaints to HR, Dr. Chao informed her that she was going to receive another performance review even though she had just had a very positive review that resulted in her receiving a 3% merit increase on April 3, 2023.  There is no reason why Dr. Nwankpah should have been subjected to another review at that point in time, and Dr. Chao's insistence that she review Dr. Nwankpah again reeked of retaliation.  Indeed, upon information and belief, no similarly situated, non-protected leader at the Company has been subjected to multiple performance reviews in a three (3) month span like Dr. Nwankpah, especially when they were strong performers like Dr. Nwankpah proved to be.

40.    As Dr. Nwankpah feared, this second review from Dr. Chao was undeniably retaliatory and was littered with unfair criticism, false statements and inaccuracies that were clearly designed to fabricate performance issues that did not exist.

41.    Moreover, Dr. Chao actually confirmed the retaliatory nature of this second review when she told Dr. Nwankpah that she and Dr. Brull wanted to review her again in light of the complaints she had submitted.  In response, Dr. Nwankpah highlighted the inaccuracies and misrepresentations contained in this review to Dr. Chao and Dr. Brull, but they refused to change their unfair critiques.  It was clear to Dr. Nwankpah that her superiors had no interest in accurately reviewing her consistently strong performance,

and that the Company was engaging in retaliatory efforts to create a record that could be used to support her unlawful termination.

42.     The joint meeting with HR was scheduled to take place a few days after Dr. Nwankpah was reviewed for the second time, but, to her surprise, HR canceled the meeting and never rescheduled it.   HR did not initiate any sort of investigation into Dr. Nwankpah's complaints despite its obligation to do so, which made Dr. Nwankpah fear she was going to be unlawfully terminated.

43.     As a result of HR's failure to address her complaints, Dr. Nwankpah again reached out to Mr. Swann for help with her concerns of discrimination and retaliation. Mr. Swann once more failed to escalate Dr. Nwankpah's report or conduct any sort of investigation, paving the way for Dr. Nwankpah's wrongful termination.

44.     Dr. Chao's retaliation and mistreatment of Dr. Nwankpah continued to escalate over the next few weeks to the point where Dr. Nwankpah felt she had no choice but to contact HR herself to try to reschedule the joint meeting in an effort to curb the constant unlawful treatment she was facing. When Dr. Nwankpah finally spoke with HR, she was accused of undermining that department's authority by speaking with Mr. Swann about the racially sensitive and retaliatory issues she was experiencing, even though these concerns fell directly within the scope of his job duties and Dr. Nwankpah had the right to discuss her mistreatment with anyone she wished, especially someone in leadership.   HR mentioned nothing about any efforts made to investigate Dr. Nwankpah's claims, but instead told Dr. Nwankpah that they were "concerned" for her

position with the Company, indicating that Dr. Nwankpah may soon be facing even more retaliation.

45.    Sure enough, the very next day, on April 18, 2023, HR met with Dr. Nwankpah and unceremoniously terminated her.  At that time, Dr. Nwankpah was told she was being terminated because of her "performance from the beginning."

46.    Upon information and belief, Dr. Nwankpah was replaced by someone outside of her protected class.

47.    Upon information and belief, the real reason Defendant terminated Dr. Nwankpah is because of her race and for consistently engaging in protected activity by making reports of discrimination and retaliation.

48.    Upon information and belief, Defendant and its employees/agents - including, but not limited to, Dr. Chao - have made it a pattern and practice to discriminate against African American employees, including Plaintiff, in favor of employees outside of that protected class.

49.    Upon information and belief, Defendant and its employees/agents - including, but not limited to, Dr. Chao - have made it a pattern and practice to retaliate against employees for engaging in protected activity.

50.    Upon information and belief, Defendant was well-aware of its employees/agents' - including, but not limited to, Dr. Chao - propensity to subject African American employees to discrimination, harassment and retaliation, but allowed those agents to remain employed as leaders, including as Dr. Nwankpah's supervisor.

51.     Defendant failed to properly train and ensure employee compliance with state and federal anti-harassment, discrimination and retaliation laws, which directly caused the resulting harm Dr. Nwankpah experienced during her employment.

52.     Defendant failed to take any action to protect Dr. Nwankpah from harassment, discrimination, and retaliation and, instead, ratified her unlawful treatment and ignored her protected complaints.

53.     Defendant subjected Dr. Nwankpah to different terms and conditions of employment than her comparators outside her protected class by saddling her with significantly more responsibility and work, failing to adequately onboard and train her, fostering a hostile work environment, fabricating performance issues, failing to investigate her repeated reports of unfair treatment discrimination and retaliation, terminating her in retaliation for her engagement in protected activity despite her demonstrably good performance.

54.     Defendant has engaged in a pattern of conduct that has created, aided and abetted a hostile work environment where discrimination, harassment and retaliation led to the unlawful termination of Dr. Nwankpah.

55.     Defendant engaged in this wrongful conduct with the intention of inflicting severe emotional distress upon Dr. Nwankpah by blatantly subjecting her to a hostile work environment, discrimination and retaliation.

56.     In addition, after Dr. Nwankpah was terminated, Aledade wrongfully withheld payment of wages owed to her, including bonus payments and expense reimbursement.

57.     Specifically, Dr. Nwankpah and Aledade had an agreement in which Dr. Nwankpah was entitled to receive two (2) bonuses - one for each of her markets - for approximately $20,000 to $50,000 per bonus.  Based on the Parties' agreement, Aledade was responsible for paying these bonuses to Dr. Nwankpah by the end of the first quarter of 2023 (approximately April 2023) if she worked any part of 2022 in those markets.

58.     Dr. Nwankpah fully complied with her obligations to lead the Mississippi and North Carolina markets throughout 2022 and through April 2023, as a result, met the requirements necessary to receive those promised bonus payments.

59.     In breach of the Parties' Agreement, Aledade failed to pay these bonuses to Dr. Nwankpah in April 2023 as agreed or at any time after her wrongful termination.

60.     At the time Aledade promised it would pay Dr. Nwankpah these additional bonuses, Aledade knew its representations were false and/or it had a reckless disregard for their veracity.

61.     Aledade made these representations to Dr. Nwankpah for the express purpose of inducing her to accept additional responsibility without a wage increase and to remain working for the Company, even though it had no intention of honoring those obligations and/or recklessly disregarded whether or not they would.

62.     These bonus promises were material to Dr. Nwankpah's decision to remain employed by the Company, and she justifiably and foreseeably relied on them when she continued to work her two (2) markets - unlike her comparators - throughout 2022 and into 2023 without any additional pay.

63.     In addition to the Parties' contract terms, Maryland wage laws required Aledade to pay these earned bonuses and all other wages owed to Dr. Nwankpah on or before the day on which Dr. Nwankpah would have been paid those wages if her employment had not been terminated.  *See* Md. Code, Lab. & Empl. Art., §§3-501 – 3-509.

64.     Upon information and belief, other Regional Directors not in Dr. Nwankpah's protected class were also promised similar bonuses for work performed in their respective markets for 2022.  Upon information and belief, Aledade complied with its agreement to pay market-based bonuses to those comparators and paid those additional earned bonuses to them in 2023.

65.     Aledade likewise failed to reimburse Dr. Nwankpah for the travel expenses she incurred while employed that were at all times approved by the Company, including, but not limited to, airfare, hotel accommodations, rental cars and more, in violation of Maryland wage laws.

66.     As a direct and proximate cause of Defendant's wrongful conduct, Dr. Nwankpah has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue into the future.

67.     As a result of Defendant's wrongful conduct, Dr. Nwankpah filed a dual charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Civil Rights ("MCCR") on September 27, 2023.  (See Dual Agency Charge, attached as Exhibit A).  Dr. Nwankpah received her Right to Sue letter on January 8, 2025.  (See Right to Sue Letter, attached as Exhibit B).  As such, Plaintiff has satisfied all administrative remedies.

## COUNT I: DISCRIMINATION, RETALIATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. §1981

68.     Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

69.     Plaintiff is an African American and, under 42 U.S.C. §1981, a member of a statutorily protected class.

70.     Plaintiff was qualified for her position as Regional Medical Director and, throughout her employment, fully competent to perform her essential job duties.

71.     Defendant treated Plaintiff less favorably and subjected Plaintiff to different terms and conditions of employment than similarly situated employees outside her protected class by saddling her with significantly more responsibility and work, failing to adequately onboard and train her, fostering a hostile work environment, failing to investigate her repeated reports of unfair treatment discrimination and retaliation, terminating her in retaliation for her engagement in protected activity despite her demonstrably good performance and failing to pay all earned wages to her upon termination.

72.     Plaintiff engaged in activity protected by 42 U.S.C. §1981 when she repeatedly reported the unlawful discriminatory and retaliatory conduct of her superiors.

73.     In response, Defendant failed to and/or refused to investigate Plaintiff's claims and unlawfully retaliated against Plaintiff based upon her engagement in protected activity.

74.     Defendant subjected Plaintiff to severe, pervasive and unwelcome race discrimination, harassment, retaliation and adverse employment action, including the termination of her employment in violation of 42 U.S.C. §1981.

75.     Defendant ultimately terminated Plaintiff's employment because of her race and for engaging in protected activity.

76.     Defendant's proffered reason for terminating Plaintiff is a pretext for race discrimination and retaliation.

77.     Upon information and belief, Defendant replaced Plaintiff with someone outside of her protected class.

78.     Defendant was well-aware of the race discrimination, harassment and retaliation Plaintiff was experiencing and perpetuated the unlawful treatment, failed to properly train employees to comply with anti-harassment, discrimination and retaliation laws, ratified unlawful treatment and failed to take any corrective action, including, but not limited to, investigating Plaintiff's complaints.

79.     Defendant subjected Plaintiff to discrimination and a hostile work environment, including subjecting her to different terms and conditions of employment

than similarly situated employees not in her protected class, treating her less favorably than those comparators and ultimately terminating her employment because of her race.

80.    Defendant also subjected Plaintiff to retaliation by promoting a hostile work environment, fabricating performance issues, ignoring her protected complaints and terminating her as a direct result of Plaintiff's engagement in protected activity.

81.    Defendant failed to exercise reasonable care to prevent and promptly correct racially discriminatory and retaliatory behavior in the workplace.

82.    Defendant's failure to comply with their duty to ensure that the workplace is free of race discrimination, harassment and retaliation caused Plaintiff to be unlawfully terminated.

83.    By the conduct described above, Defendant deprived Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges of her employment relationship with Defendant, which constitutes a contractual relationship pursuant to 42 U.S.C. §1981.

84.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

**COUNT II: DISCRIMINATION, RETALIATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 USCS §2000e**

102.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

103.    Plaintiff is an African American and, under 42 USCS §2000e, a member of a statutorily protected class.

104.    Plaintiff was qualified for her position as Regional Medical Director and, throughout her employment, fully competent to perform her essential job duties.

105.    Defendant treated Plaintiff less favorably and subjected Plaintiff to different terms and conditions of employment than similarly situated employees outside her protected class by saddling her with significantly more responsibility and work, failing to adequately onboard and train her, fostering a hostile work environment, failing to investigate her repeated reports of unfair treatment discrimination and retaliation, terminating her in retaliation for her engagement in protected activity despite her demonstrably good performance and failing to pay all earned wages to her upon termination.

106.    Plaintiff engaged in activity protected by 42 U.S.C. §2000e when she repeatedly reported the unlawful discriminatory and retaliatory conduct of her superiors.

107.    In response, Defendant failed to and/or refused to investigate Plaintiff's claims and unlawfully retaliated against Plaintiff based upon her engagement in protected activity.

108.    Defendant subjected Plaintiff to severe, pervasive and unwelcome race discrimination, harassment, retaliation and adverse employment action, including the termination of her employment in violation of 42 U.S.C. §2000e.

109.    Defendant ultimately terminated Plaintiff's employment because of her race and for engaging in protected activity.

110.    Defendant's proffered reason for terminating Plaintiff is a pretext for race discrimination and retaliation.

111.    Upon information and belief, Defendant replaced Plaintiff with someone outside of her protected class.

112.    Defendant was well-aware of the race discrimination, harassment and retaliation Plaintiff was experiencing and perpetuated the unlawful treatment, failed to properly train employees to comply with anti-harassment, discrimination and retaliation laws, ratified unlawful treatment and failed to take any corrective action, including, but not limited to, investigating Plaintiff's complaints.

113.    Defendant subjected Plaintiff to discrimination and a hostile work environment, including subjecting her to different terms and conditions of employment than similarly situated counterparts not in her protected class, treating her less favorably than those counterparts and ultimately terminating her employment because of her race.

114.    Defendant also subjected Plaintiff to retaliation by promoting a hostile work environment, fabricating performance issues, ignoring her protected complaints and terminating her as a direct result of Plaintiff's engagement in protected activity.

115.    Defendant failed to exercise reasonable care to prevent and promptly correct racially discriminatory and retaliatory behavior in the workplace.

116.    Defendant's failure to comply with their duty to ensure that the workplace is free of race discrimination, harassment and retaliation caused Plaintiff to be unlawfully terminated.

117.    By the conduct described above, Defendant deprived Plaintiff of her right to maintain all benefits and privileges of her employment relationship with Defendant, which constitutes a contractual relationship pursuant to 42 USCS §2000e.

118.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

119.    Plaintiff received her Right to Sue letter from the Equal Employment Opportunity Commission/Maryland Commission on Civil Rights on January 8, 2025. Accordingly, Plaintiff has met all procedural requirements for bringing these claims.

## COUNT III:   DISCRIMINATION, RETALIATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF STATE LAW

120.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

121.    At all times material herein, Plaintiff qualified as an "employee" of Defendant under Md. State Government Code Ann. §20-601(c).

122.    At all times relevant herein, Defendant qualified as an "employer" under Md. State Government Code Ann. §20-601(d).

123.    Plaintiff is an African American and, under Md. State Government Code Ann. §20-606, a member of a statutorily protected class.

124.    Plaintiff was qualified for her position as Regional Medical Director and, throughout her employment, fully competent to perform her essential job duties.

125.    Defendant treated Plaintiff less favorably and subjected Plaintiff to different terms and conditions of employment than similarly situated employees outside her protected class by saddling her with significantly more responsibility and work, failing to adequately onboard and train her, fostering a hostile work environment, failing to investigate her repeated reports of unfair treatment discrimination and retaliation, terminating her in retaliation for her engagement in protected activity despite her demonstrably good performance and failing to pay all earned wages to her upon termination.

126.    Plaintiff engaged in protected activity when she repeatedly reported the unlawful discriminatory and retaliatory conduct of her superiors.

127.    In response, Defendant failed to and/or refused to investigate Plaintiff's claims and unlawfully retaliated against Plaintiff based upon her engagement in protected activity.

128.    Defendant subjected Plaintiff to severe, pervasive and unwelcome race discrimination, harassment, retaliation and adverse employment action, including the termination of her employment in violation of Md. State Government Code Ann. §20-606.

129.    Defendant ultimately terminated Plaintiff's employment because of her race and for engaging in protected activity.

130.    Defendant's proffered reason for terminating Plaintiff is a pretext for race discrimination and retaliation.

131.    Upon information and belief, Defendant replaced Plaintiff with someone outside of her protected class.

132.    Defendant was well-aware of the race discrimination, harassment and retaliation Plaintiff was experiencing and perpetuated the unlawful treatment, failed to properly train employees to comply with anti-harassment, discrimination and retaliation laws, ratified unlawful treatment and failed to take any corrective action, including, but not limited to, investigating Plaintiff's complaints.

133.    Defendant subjected Plaintiff to discrimination and a hostile work environment, including subjecting her to different terms and conditions of employment than similarly situated counterparts not in her protected class, treating her less favorably than those counterparts and ultimately terminating her employment because of her race.

134.    Defendant also subjected Plaintiff to retaliation by promoting a hostile work environment, fabricating performance issues, ignoring her protected complaints and terminating her as a direct result of Plaintiff's engagement in protected activity.

135.    Defendant failed to exercise reasonable care to prevent and promptly correct racially discriminatory and retaliatory behavior in the workplace.

136.    Defendant's failure to comply with their duty to ensure that the workplace is free of race discrimination, harassment and retaliation caused Plaintiff to be unlawfully terminated.

137.    Defendants violated Md. State Government Code Ann. §20-606  by discriminating against Plaintiff on the basis of her race, creating a hostile work environment and retaliating against her for engaging in protected activity.

138.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

**COUNT IV:  NEGLIGENT RETENTION, TRAINING & SUPERVISION**

139.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

140.    Defendant has a duty to train employees to comply with Federal and State anti-discrimination laws to prevent employees from being subjected to discrimination, harassment and retaliation, among other things.

141.    Defendant has a duty to ensure that the workplace is free of race discrimination, harassment and retaliation.

142.    Defendant has a duty to only retain employees who comply with Federal and State anti-discrimination laws to prevent employees from being subjected to discrimination, harassment and retaliation, among other things.

143.    Defendant has a duty to train and supervise employees to comply with Federal and State anti-discrimination laws to prevent employees from being subjected to discrimination, harassment and retaliation, among other things.

144.    Defendant wrongfully breached its duty to train, supervise and retain employees to comply with Federal and State anti-discrimination laws and its duty to only retain employees who complied with those same laws by continuing to employ individuals who consistently violate anti-discrimination and retaliation laws, including Dr. Chao.

145.    Defendant was well-aware of the propensity of its employees - including, but not limited to, Dr. Chao - to intentionally and maliciously violate federal and state anti-discrimination and anti-retaliation laws.  Defendant was aware that Dr. Chao has been the subject of other workplace discrimination complaints similar to that made by Plaintiff.  Defendant repeatedly ratified that conduct and continued to employ Dr. Chao and other violating employees without any repercussions in spite of their undeniably unlawful workplace conduct.

146.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT V: BREACH OF CONTRACT

147.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

148.    Plaintiff and Defendant expressly agreed to a contract where Defendant promised to pay Plaintiff two (2) additional bonuses of approximately $20,000 to $50,000 each if Plaintiff agreed to work both the Mississippi and North Carolina markets in 2022.

Defendant also promised to pay these bonuses to Plaintiff by or around the first quarter of 2023 (approximately April 2023).

149.    Plaintiff fully complied with all her obligations under this contract by accepting the additional responsibility of leading two (2) markets from 2022 through April 2023.

150.    Defendant, however, breached the contract by failing to pay Plaintiff these earned bonuses in April 2023 or anytime thereafter.

151.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

### COUNT VI: FAILURE TO PAY WAGES IN VIOLATION OF MWHL
### (Md. Code Lab. & Empl. §§3-401 et seq.)

152.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

153.    At all times relevant herein, Defendant was an employer covered by the MWHL.

154.    At all times relevant herein, Plaintiff was an employee covered by the MWHL.

155.    Defendant violated the wage provisions of MWHL §3-401, *et. seq.*, by failing to pay Plaintiff all her earned wages, including bonuses owed and travel expenses incurred.

156.    Defendant's failure to pay Plaintiff's promised bonuses and approved travel expenses at any time after her termination violated the compensation requirements set forth in the MWHL.

157.    These violations injured Plaintiff in that she did not receive wages due and owing to her pursuant to Maryland law.

158.    Defendant's failure and refusal to pay Plaintiff's wages was not the result of *any bona fide* dispute.

159.    Defendant's failure to pay Plaintiff's wages, as required by the MWHL, was knowing, willful, intentional and not in good faith.  Defendant either knew or showed a reckless disregard for whether their conduct was prohibited by statute.

160.    Md. Code Lab. & Empl. §3-427 provides that Defendant, having violated §§3-401 et seq. and injured Plaintiff, shall be liable for actual damages, liquidated damages, and reasonable counsel fees and other costs.

## COUNT VII:  FAILURE TO PAY WAGES IN VIOLATION OF MWPCL
### (Md. Code Lab. & Empl. §§3-501 et seq.)

161.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

162.    At all times relevant herein, Defendant was an employer covered by the MWPCL.

163.    At all times relevant herein, Plaintiff was an employee covered by the MWPCL.

164.    Defendant violated the wage provisions of MWPCL §§3-501 et seq. by failing to pay Plaintiff all her earned wages, including bonuses owed and travel expenses incurred.

165.    Defendant's failure to pay Plaintiff's promised bonuses and approved travel expenses at any time after her termination violated the compensation requirements set forth in MWPCL §§3-501 et seq.

166.    These violations injured Plaintiff in that she did not receive wages due and owing to her pursuant to Maryland law.

167.    Defendant's failure and refusal to pay Plaintiff's wages was not the result of *any bona fide* dispute.

168.    Defendant's failure to pay Plaintiff's wages, as required by MWPCL §§3-501 et seq., was knowing, willful, intentional and not in good faith.  Defendant either knew or showed a reckless disregard for whether their conduct was prohibited by statute.

169.    MWPCL §3-507 provides that Defendant, having violated §§3-501 et seq. and injured Plaintiff, may be liable for actual damages, liquidated damages in an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

## COUNT VIII: FRAUD/FRAUDULENT INDUCEMENT

170.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

171.    Plaintiff and Defendant expressly agreed to a contract where Defendant promised to pay Plaintiff two (2) additional bonuses of approximately $20,000 to $50,000

each if Plaintiff agreed to work both the Mississippi and North Carolina markets in 2022. Defendant also promised to pay these bonuses to Plaintiff by or around the first quarter of 2023 (approximately April 2023).

172.    At the time Defendant made these promises, it knew they were false and/or they had a reckless disregard for their veracity.

173.    Defendant made these representations to Plaintiff for the express purpose of inducing her to accept additional responsibility without a wage increase and to remain working for the Company, even though it had no intention of honoring those obligations and/or recklessly disregarded whether or not they would.

174.    These bonus promises were material to Plaintiff's decision to remain employed by Defendant, and she relied on them when she continued to work her two (2) markets - unlike her comparators - throughout 2022 and into 2023 without any other additional pay.

175.    Plaintiff's reliance on Defendant's representations and promises was reasonable and foreseeable.

176.    Plaintiff fully complied with all her obligations under this contract by accepting the additional responsibility of leading two (2) markets from 2022 through April 2023.

177.    Defendant, however, breached the contract by failing to pay Plaintiff these earned bonuses in April 2023 or anytime thereafter.

178.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

<u>COUNT IX: PROMISSORY ESTOPPEL</u>

179.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

180.    Defendant made a clear and unambiguous promise to Plaintiff when it expressly agreed to a contract where Defendant promised to pay Plaintiff two (2) additional bonuses of approximately $20,000 to $50,000 each if Plaintiff agreed to work both the Mississippi and North Carolina markets in 2022.  Defendant also promised to pay these bonuses to Plaintiff by or around the first quarter of 2023 (approximately April 2023).

181.    Plaintiff's reliance on Defendant's representations and promises was reasonable and foreseeable.

182.    Plaintiff fully complied with all her obligations under this contract by accepting the additional responsibility of leading two (2) markets from 2022 through April 2023.

183.    Defendant, however, breached the contract by failing to pay Plaintiff these earned bonuses in April 2023 or anytime thereafter.

184.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT X: UNJUST ENRICHMENT

185.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

186.    Plaintiff conferred a significant benefit on Defendant by agreeing to lead two (2) markets without a salary increase after she had been promised the same salary for work in one (1) market.  Defendant also benefitted from the travel and work Plaintiff performed for which she incurred expenses, including, but not limited to, airfare, hotel accommodations and rental cars.

187.    Defendant is well aware of the benefits conferred by Plaintiff and it would be truly unjust for it to retain those benefits without fully compensating Plaintiff with the wages owed her.

188.    Despite Defendant's knowledge of the benefits conferred by Plaintiff, Defendant has completely failed to uphold their contractual and statutory obligations to pay her all wages owed to her.

189.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT XI:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

190.    Plaintiff incorporates by reference all the allegations contained in the preceding paragraphs of the Complaint.

191.    Defendant intentionally and/or with reckless disregard inflicted severe emotional distress on Plaintiff.

192.    Defendant's conduct was extreme and outrageous because it intentionally subjected Plaintiff to severe and pervasive race discrimination, harassment and retaliation throughout her employment by saddling her with significantly more responsibility and work than similarly situated employees outside her protected class, failing to adequately onboard and train her, fostering a hostile work environment, fabricating performance issues, failing to investigate her repeated reports of unfair treatment discrimination and retaliation, terminating her because of her race and in retaliation for her engagement in protected activity despite her demonstrably good performance and failing to pay all earned wages to her upon termination.

193.    In addition, among other things, Defendant's intentional conduct has severely damaged Plaintiff's reputation, which has adversely affected her ability to find subsequent comparable employment, and caused her to suffer serious emotional distress.

194.    As a direct and proximate cause of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

(a)     Issue a permanent injunction:

    i.     Requiring Defendant to abolish discrimination, harassment and retaliation.

    ii.     Requiring allocation of significant funding and trained staff to implement all changes within two years.

    iii.     Requiring removal or demotion of all employees who have engaged in discrimination, harassment or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter unlawful conduct against employees.

    iv.     Creating a process for the prompt investigation of discrimination, harassment and/or retaliation complaints.

    v.     Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment and retaliation issues, investigations, and appropriate corrective actions.

    vi.     Requiring Defendant to expunge Plaintiff's personnel file of all negative documentation.

vii.    Requiring Defendant to cease and desist from any employment practice which discriminates against Plaintiff or others on the basis of race, color, national origin, religion, sex, military status, disability, age, or ancestry, or in retaliation against the person because he or she complained about such discrimination;

(b)    For an award against Defendant of compensatory and monetary damages to compensate Plaintiff for lost and wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c)    For an award of liquidated damages, for a total damage award in the amount of three (3) times the unpaid wages described in the preceding subsection, as authorized by the MWHL §3-427 and MWPCL §3-507.

(d)    For an award of punitive damages against any Defendant to the extent allowable by law in an amount in excess of $25,000;

(e)    For an award of reasonable attorney's fees and non-taxable costs for Plaintiff's claims as allowable under law and authorized by MWHL §3-427 and MWPCL §3-507.

(f)    For an award of the taxable costs of this action; and

(g)    For an award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,


/s/  Gwen-Marie Davis
Gwen-Marie Davis (Fed Bar No.:  29340)
GDH LAW, LLC
4200 Parliament Place, Suite 510
Lanham, MD  20706
Telephone: 301.769.6835
Email: gdavis@gdhlawfirm.com

Counsel for Plaintiff
AMARACHI NWANKPAH


## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Amarachi

Nwankpah demands a trial by jury on all issues so triable and by the maximum number

of jurors permitted.


/s/  Gwen-Marie Davis
Gwen-Marie Davis

One of the Attorneys for Plaintiff
AMARACHI NWANKPAH