IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AMARACHI NWANKPAH, | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. DLB-25-1122 |
| ALEDADE, INC., | * | |
| Defendant. | * | |

**MEMORANDUM OPINION**

Dr. Amarachi Nwankpah filed this action against her former employer, Aledade, Inc. ("Aledade"), alleging violations of federal and state anti-discrimination laws, Maryland wage laws, and Maryland common law. Aledade has moved to dismiss six of the 12 counts in Dr. Nwankpah's amended complaint. Specifically, Aledade argues that Dr. Nwankpah's claims for a violation of the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401 *et seq.*; "fraud/fraudulent inducement"; promissory estoppel; unjust enrichment; intentional infliction of emotional distress ("IIED"); and intentional discrimination in violation of 42 U.S.C. § 1981a must be dismissed for failure to state a claim. For the reasons that follow, the motion is granted in part and denied in part.

I.  **Background**

Dr. Nwankpah alleges the following in her amended complaint.

Dr. Nwankpah is African American. ECF 8, ¶ 9. Aledade is a network of primary care organizations "that serves more than 2,400 primary care practices and community health centers across 46 states." *Id.* ¶ 7. On August 19, 2022, Aledade hired Dr. Nwankpah as a Regional Medical Director. *Id.* ¶ 9. Two Caucasian individuals also were hired as Regional Medical Directors at the

same time as Dr. Nwankpah. *Id.* ¶ 13. During her interview for the position, Dr. Nwankpah was told that she would be responsible only for Aledade's North Carolina market. *Id.* ¶ 12.

After she began working for Aledade, Dr. Nwankpah was put in charge of Aledade's Mississippi market; this responsibility was in addition to her responsibility for overseeing the North Carolina market. *Id.* Dr. Nwankpah states that "Aledade induced [her] into accepting this significant change in responsibility by promising her that she would be entitled to receive two . . . additional bonuses - one for each market - if she continued her employment." *Id.* ¶ 14. Aledade represented that each bonus would be worth between $20,000 and $50,000 and that if Dr. Nwankpah worked during any part of 2022, she would be entitled to her bonuses by the end of the first quarter of 2023. *Id.* Dr. Nwankpah did not receive an increase in salary in exchange for assuming responsibility for the Mississippi market. *Id.* ¶ 15. No other Regional Medical Director was put in charge of two markets at once. *Id.* ¶ 13. Other Regional Medical Directors "were assigned to oversee only one . . . market each with significantly less work for essentially the same pay." *Id.*

Dr. Nwankpah states that "the Mississippi market . . . was one of the most difficult markets for Regional [Medical] Directors to work with given its high turnover rate and other factors." *Id.* ¶ 18. When Dr. Nwankpah was put in charge of the two markets, her workload ballooned. *Id.* ¶¶ 16, 19. She and her colleagues "knew it would be extremely difficult for her or anyone else to handle both these markets simultaneously due to the need for significant onboarding and the mountain of work it would entail." *Id.* ¶ 19. Dr. Nwankpah also states that, due to Mississippi's "well-known history of intense racial discrimination and persecution, which remains ongoing," she "had concerns about working in the Mississippi market." *Id.* ¶ 20.

2

Dr. Nwankpah was supervised by Dr. Lelin Chao, an Asian woman. *Id.* ¶ 17. Dr. Chao in turn was supervised by Dr. Jennifer Brull, who was Caucasian. *Id.* ¶ 22. Dr. Nwankpah repeatedly asked Dr. Chao and Dr. Brull for support in managing her increased workload and in adjusting to her new responsibilities, but they did not provide her with meaningful support. *Id.* ¶¶ 17, 22. "The only real tool" that Dr. Nwankpah received "was a 30-60-90 day plan generated by Dr. Brull that was created for [r]egional [medical] [d]irectors in charge of only one . . . market," which Dr. Chao "confirmed . . . did not apply to Dr. Nwankpah based on her extensive workload." *Id.* ¶ 23. Without her supervisors' support, Dr. Nwankpah was "left to train and supervise herself, doing everything she could to learn from other employees to be successful." *Id.* ¶ 17. Dr. Nwankpah states that other Regional Medical Directors who were not African American and had less responsibility than she did were provided with more support. *Id.* ¶¶ 16, 22.

Dr. Chao began to "subject[ ] [Dr. Nwankpah] to unfair scrutiny . . . in a manner that was completely inconsistent with the way her counterparts and other leaders in [Aledade] were treated." *Id.* ¶ 24. For instance, in November 2022, Dr. Chao "question[ed] Dr. Nwankpah on her dedication to" Aledade after Dr. Nwankpah attended a workplace retreat virtually due to illness—even though other employees, including another Caucasian Regional Medical Director, also attended the retreat virtually but were not questioned or reprimanded in the same manner. *Id.* ¶¶ 25–27. Nonetheless, Dr. Chao gave Dr. Nwankpah a positive performance review the following month. *Id.* ¶ 30.

In January 2023, Dr. Nwankpah reported "her concerns about the discriminatory treatment she had been facing from Dr. Chao" to Joshua Swann, Aledade's vice president of diversity, equity, and inclusion. *Id.* ¶ 28. Swann "told Dr. Nwankpah that he was not happy with Dr. Chao's conduct and suggested [that Dr. Nwankpah] contact Human Resources." *Id.* Dr. Nwankpah did

3

not do so because she feared that Dr. Chao would retaliate against her and "hop[ed], without much confidence, that the unfair treatment would improve." *Id.* Swann's position obligated him "to escalate Dr. Nwankpah's reports to upper management, including Human Resources, but he failed to do so" and Dr. Nwankpah's concerns went unaddressed. *Id.* ¶ 29.

In February 2023, Aledade circulated a survey asking employees to "rat[e] their experience with the [c]ompany."[1] *Id.* ¶ 31. The survey purported to be anonymous and confidential, and it "directly stated that the responses would not be shared with the reporting employee's manager." *Id.* In reliance on these representations, Dr. Nwankpah "felt comfortable being open and honest about the issues she was experiencing with Dr. Chao" in the survey and "specifically detailed the differential treatment and other issues she had been experiencing." *Id.* However, Dr. Nwankpah's responses were shared with Dr. Chao and Dr. Brull; in fact, hers was the only survey to be shared with a supervisor. *Id.* After Dr. Nwankpah's responses were shared, "Dr. Chao became increasingly hostile and retaliatory" towards her. *Id.* ¶ 33. For instance, Dr. Chao "privately met with Dr. Nwankpah's entire field team and subordinates - without any notice to Dr. Nwankpah" and "rallied [her] team against her" while "solicit[ing] criticism of her performance and leadership behind her back." *Id.* ¶ 34. Following this meeting, Dr. Nwankpah's team began "copying Dr. Chao on all communications with Dr. Nwankpah" at Dr. Chao's direction and began referring to Dr. Nwankpah by her first name only instead of by her honorific. *Id.* ¶ 35.

In late February or early March 2023, Dr. Nwankpah again reported her concerns to Swann, who told her that "he believed the way Dr. Chao had been treating her was inappropriate"

---

[1] Dr. Nwankpah states that this survey was circulated in February 2022. The Court presumes that this is a scrivener's error and that Dr. Nwankpah meant to say February 2023 because Dr. Nwankpah alleges that she was hired in August 2022 and fired in April 2023. Thus, the only February during which Dr. Nwankpah would have been employed by Aledade was February 2023.

4

and "encouraged [her] to meet with Human Resources to discuss these serious, racially motivated issues." *Id.* ¶ 37. Swann again failed to make any report to Human Resources on his own. *Id.* In early March 2023, however, Dr. Nwankpah did meet with two Human Resources representatives, Lauren Simmers and Patricia Sias, "to detail the discriminatory and retaliatory treatment she had been experiencing." *Id.* ¶ 38. Summers and Sias "apologized to Dr. Nwankpah for her experience, acknowledged the wrongfulness of Dr. Chao's conduct and told her that no one should be treated the way she had been." *Id.* Summers and Sias also proposed that Dr. Nwankpah, Dr. Chao, and Dr. Brull meet with Human Resources together to "try to resolve the issues raised by Dr. Nwankpah and create a plan moving forward," and they assured Dr. Nwankpah that she would not be retaliated against for continuing to report Dr. Chao's conduct. *Id.* ¶ 39. On the basis of that assurance, Dr. Nwankpah agreed to a joint meeting. *Id.*

Shortly after Dr. Nwankpah reported her concerns to Human Resources, Dr. Chao told Dr. Nwankpah that she would give her another performance review, "even though she had just had a very positive review." *Id.* ¶ 40. Dr. Chao told Dr. Nwankpah that "she and Dr. Brull wanted to review [Dr. Nwankpah] again in light of the complaints she had submitted." *Id.* ¶ 42. Dr. Chao's second review "was littered with unfair criticism, false statements and inaccuracies" that Dr. Nwankpah believes "were clearly designed to fabricate performance issues that did not exist." *Id.* ¶ 41. Dr. Nwankpah states that "no [other] similarly situated, non-protected leader at [Aledade] . . . [was] subjected to multiple performance reviews in a three . . . month span." *Id.* ¶ 40.

Although "[t]he joint meeting with [Human Resources] was scheduled to take place a few days after Dr. Nwankpah was reviewed for the second time," Human Resources "canceled the meeting and never rescheduled it." *Id.* ¶ 43. Human Resources never conducted "any sort of investigation into Dr. Nwankpah's complaints despite its obligation to do so." *Id.* Dr. Nwankpah

5

again contacted Swann, but he "once more failed to escalate Dr. Nwankpah's report or conduct any sort of investigation." *Id.* ¶ 44. Dr. Nwankpah then reached out to Human Resources, after weeks of "escalat[ing]" "retaliation and mistreatment" by Dr. Chao. *Id.* ¶ 45. Human Resources representatives accused Dr. Nwankpah "of undermining th[e] department's authority by speaking with" Swann and told her that "they were 'concerned' for her position with [Aledade]." *Id.*

On April 18, 2023, Dr. Nwankpah was fired from Aledade; she was later replaced by someone who was not African American. *Id.* ¶¶ 46–47. Dr. Nwankpah was never paid the bonuses that she was promised in exchange for her management of the North Carolina and Mississippi markets, despite having "fully complied with her obligations to lead" those markets "throughout 2022 and through April 2023." *Id.* ¶¶ 59–61. She states that other Regional Medical Directors who were not African American "were also promised similar bonuses for work performed in their respective markets for 2022" and received those bonuses from Aledade in 2023. *Id.* ¶ 66. Dr. Nwankpah also states that Aledade never reimbursed her "for the travel expenses she incurred while employed that were at all times approved by [Aledade]." *Id.* ¶ 67.

Dr. Nwankpah filed a dual charge with the Equal Employment Opportunity Commission and the Maryland Commission on Civil Rights on September 27, 2023 and received a right to sue letter on January 8, 2025. *Id.* ¶ 69. She filed suit in this Court on April 4, 2025. ECF 1. On April 8, she filed a 12-count amended complaint. ECF 8. As relevant to the present motion, Dr. Nwankpah asserted claims of failure to pay wages in violation of the MWHL (Count VI); "fraud/fraudulent inducement" (Count VIII); promissory estoppel (Count IX); unjust enrichment

6

(Count X); IIED (Count XI); and intentional discrimination in violation of 42 U.S.C. § 1981a (Count XII). She seeks damages and injunctive relief.[2]

On June 4, 2025, Aledade filed a motion to dismiss Counts VI, VIII, IX, X, XI, and XII for failure to state a claim and memorandum in support, ECF 18, 18-1, and an answer to the remaining counts, ECF 19. Dr. Nwankpah opposes the motion to dismiss, ECF 24, and Aledade has filed a reply, ECF 26. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

**II.     Standard of Review**

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and

---

[2] Specifically. Dr. Nwankpah wants Aledade to "abolish discrimination, harassment and retaliation"; "allocat[e] . . . significant funding and trained staff to implement all changes within two years"; "remov[e] or demot[e] . . . all employees who have engaged in discrimination, harassment or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter unlawful conduct against employees"; "[c]reat[e] a process for the prompt investigation of discrimination, harassment and/or retaliation complaints"; "[r]equir[e] mandatory and effective training for all employees and supervisors on discrimination, harassment and retaliation issues, investigations, and appropriate corrective actions"; "expunge [her] personnel file of all negative documentation"; and "cease and desist from any employment practice which discriminates against [her] or others on the basis of race, color, national origin, religion, sex, military status, disability, age, or ancestry, or in retaliation against the person because he or she complained about such discrimination." ECF 8, ¶¶ (a)(i)–(vii) (demand for relief).

7

the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

### III. Discussion

#### A. MWHL Claim (Count VI)

Dr. Nwankpah claims that Aledade violated the MWHL by failing to pay her bonuses and travel expenses. Aledade argues that Dr. Nwankpah's MWHL claim should be dismissed because the MWHL "exclusively applies to claims for minimum wage and overtime pay violations," and Dr. Nwankpah does not claim that Aledade failed to pay her either a minimum wage or overtime. ECF 18-1, at 5. In her opposition, Dr. Nwankpah does not address Aledade's argument that her MWHL claim should be dismissed. Dr. Nwankpah thus has abandoned her MWHL claim. *See, e.g.*, *Ferdinand-Davenport v. Child.'s Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010); *Grinage v. Mylan Pharms., Inc.*, 840 F. Supp. 2d 862, 867 n.2 (D. Md. 2011). The Court will dismiss the abandoned claim with prejudice. *See, e.g.*, *Yarmohammadi v. Rubio*, No. BAH-24-2952, 2025 WL 2043719, at *7 (D. Md. Jul. 21, 2025) (dismissing claim with prejudice because the plaintiffs' opposition to the defendants' motion to dismiss did not counter the defendants' argument for dismissal of the claim, and "thus . . . [the plaintiffs] have abandoned this claim").[3]

---

[3] Even if Dr. Nwankpah had not abandoned her claim, it still would be subject to dismissal. The MWHL "requires, in relevant part, that employers pay the applicable minimum wage to their employees and . . . that they pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that the employee works during one workweek." *Friolo v. Frankel*, 819 A.2d 354, 361 (Md. 2003). Maryland's highest court has explained that, where an employee is paid above minimum wage and claims entitlement to bonuses "purely [as] a matter of contract," those bonuses may be recoverable under a breach-of-contract theory or under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501 *et seq.*, but not under the MWHL. *See id.* at 362. Dr. Nwankpah claims that she was promised bonuses and entitled to reimbursement for travel expenses, but did not receive either benefit. She does not claim, however, that Aledade's failure to pay bonuses or properly reimburse her resulted in her being paid less than minimum wage or undercompensated for any overtime that she may have worked. She thus fails to allege that Aledade violated the MWHL. *See also Hobson v. Loc. 689, Amalgamated Transit Union AFL-CIO*, No. TDC-21-2374, 2022 WL 3028073, at *4 (D. Md. Aug. 1, 2022) ("Where [the plaintiff's] alleged entitlement to regular wages owed in connection with his promotion does not implicate a claim for overtime wages, and where it is undisputed that [the plaintiff] was

Count VI is dismissed with prejudice.

### B. "Fraud/Fraudulent Inducement" Claim (Count VIII)

Dr. Nwankpah claims that Aledade is liable for "fraud/fraudulent inducement" because Aledade made a false promise that it would pay her bonuses to persuade her to take on the management of the North Carolina and Mississippi markets without an increase in salary. Aledade argues that Dr. Nwankpah has failed to plead her claim with the requisite particularity. The Court agrees with Aledade.

Under Maryland law, the elements of a fraud or fraudulent inducement claim are

> (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Bennett v. Ashcraft & Gerel, LLP*, 303 A.3d 1237, 1266 (Md. App. Ct. 2023) (citing *Sass v. Andrew*, 832 A.2d 247, 260 (Md. Ct. Spec. App. 2003)), *cert. denied*, 306 A.3d 652 (Md. 2023), *and cert. denied*, 314 A.3d 346 (Md. 2024); *see also Sass*, 832 A.2d at 260. Rule 9(b) imposes a "heightened pleading standard" on fraud plaintiffs by "requir[ing] that 'a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (quoting Fed. R. Civ. P. 9(b)). These circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). In other words, "a plaintiff must allege

---

compensated in excess of the statutory minimum wage, there can be no violation of . . . the MWHL.").

facts establishing the 'who, what, when, where, and how' of the claimed fraud." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 625 (D. Md. 2012) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison*, 176 F.3d at 783 n.5.

Were it not for Rule 9(b), Dr. Nwankpah might state a claim for fraud. She alleges that Aledade promised her bonuses to induce her to take on additional responsibility, that she reasonably relied on that promise in assuming additional duties, and that Aledade refused to pay her these bonuses upon her termination. Construing Dr. Nwankpah's allegations generously in her favor, the Court might plausibly be able to infer that Aledade did not intend to honor its promise to pay her bonuses when it made that promise, or that at the very least that Aledade made that promise with reckless disregard for whether it would honor it.

Even if Dr. Nwankpah's claim could survive a Rule 12(b)(6) analysis, Dr. Nwankpah fails to satisfy Rule 9(b)'s stringent pleading standard. Dr. Nwankpah does not specify when in 2022 the promise of additional bonuses was made, who made the promise, or the context in which the promise was made. Dr. Nwankpah alleges that "as soon as" she was hired, she was "forced" to assume additional "responsibilities," and that at some point in 2022 "after she was hired," she was put in charge of the Mississippi and North Carolina markets. ECF 8, ¶ 12. She then states that "Aledade" "induced" her to accept responsibility for the two markets by falsely "promising her that she would be entitled to receive two . . . additional bonuses," *id.* ¶ 14, and that she "relied on Aledade's explicit promises . . . when she accepted this change in responsibility," *id.* ¶ 15. From these allegations, it is unclear whether the alleged promise for bonuses was made immediately after Dr. Nwankpah was hired or at some later point during her employment. Nor is it clear which

11

Aledade employee(s) made the promise or where and in what context it was made. Dr. Nwankpah has not alleged "the 'who, what, when, where, and how' of the claimed fraud." *See Mun. Mortg. & Equity*, 876 F. Supp. 2d at 625 (quoting *Kellogg Brown & Root, Inc.*, 525 F.3d at 379). These Rule 9(b) pleading deficiencies sink her fraud claim. *See, e.g.*, *United States ex rel. Elms v. Accenture LLP*, 341 F. App'x 869, 873 (4th Cir. 2009) (affirming dismissal of fraud claim in part because, although employee alleged that "Accenture" made a misrepresentation, he "[did] not attribute this alleged misrepresentation to any Accenture employee or identify where or when any such representation was made"); *United States ex rel. Jones v. Collegiate Funding Servs., Inc.*, 469 F. App'x 244, 259 (4th Cir. 2012) (fraud claims were properly dismissed where relators "made no allegation as to any particular transactions . . . in which [allegedly false] certifications were material, nor [did] they name or identify any employee who (knowingly or not) completed a false certification form"). Dr. Nwankpah fails to state a claim for fraud or fraudulent inducement.

Count VIII is dismissed without prejudice.

### C. Promissory Estoppel and Unjust Enrichment Claims (Counts IX and X)

Dr. Nwankpah also alleges that Aledade is liable for promissory estoppel and unjust enrichment. Dr. Nwankpah predicates her promissory estoppel claim on her allegation that Aledade promised to pay her bonuses in exchange for her management of the North Carolina and Mississippi markets and that she reasonably and detrimentally relied on that promise. She predicates her unjust enrichment claim on her allegation that Aledade owes her bonus compensation for her work managing both markets and that it would be inequitable for Aledade to retain the benefit of her services without appropriately compensating her for them. Aledade argues that Dr. Nwankpah fails to state a claim on either basis. The Court is not persuaded.

A claim for promissory estoppel under Maryland law requires the plaintiff to allege:

> (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996). To state a claim for unjust enrichment under Maryland law, the plaintiff must allege: (1) "[a] benefit conferred upon the defendant by the plaintiff;" (2) "[a]n appreciation or knowledge by the defendant of the benefit; and" (3) "[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (citing *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000)).

Aledade's argument in support of dismissing the promissory estoppel and unjust enrichment claims relies almost entirely on Dr. Nwankpah's offer letter, which Aledade has attached to its motion as an exhibit. Aledade argues that this letter shows that Dr. Nwankpah "knew that she was not guaranteed a bonus" when she took the job and that accordingly she "cannot claim that she relied on a false promise . . . or that it would have been inequitable for [her] not to receive a bonus upon her termination." ECF 18-1, at 10–11. But the Court cannot consider the offer letter in ruling on the Rule 12(b)(6) motion because the offer letter is not "integral to and explicitly relied on in the complaint." *See Zak*, 780 F.3d at 607 (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). A document is "integral" to a complaint when the "claims . . . turn on, [or] are . . . otherwise based on" the document's contents. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). Dr. Nwankpah does not allege that Aledade promised her the bonus compensation via her offer letter or even that Aledade made this promise when she was hired. Indeed, Dr. Nwankpah does not mention her offer letter *at all* in her

amended complaint; nor does she attach it to her amended complaint as an exhibit. Her offer letter is neither integral to nor explicitly relied on in her amended complaint. The Court thus will not consider it at this stage.

Aledade also argues that Dr. Nwankpah fails to state an unjust enrichment claim because she "has not and cannot make any allegation that [Aledade] failed to pay her [her] salary for her services." ECF 18-1, at 12. But this argument misses the point. Dr. Nwankpah alleges that she conferred a benefit on Aledade by performing *more* work than her salary was designed to compensate her for, on the expectation that she would receive her promised bonuses in lieu of a salary increase, and that Aledade failed to pay her the bonuses she was owed for her extra work. These allegations suffice to state an unjust enrichment claim. *See, e.g.*, *Makowski v. Bovis Lend Lease, Inc.*, No. RDB-10-1844, 2011 WL 1045635, at *11 (D. Md. Mar. 17, 2011) (allegations that employee "worked hundreds of hours of overtime and weekend hours . . . with the expectation of receiving a portion of" a bonus, but that employer "refused to pay [employee] his earned portion of the bonus" stated a claim for unjust enrichment).

Aledade does not offer any other grounds for dismissal of the promissory estoppel and unjust enrichment claims.

Counts IX and X may proceed.

### D. IIED Claim (Count XI)

Dr. Nwankpah also claims that Aledade is liable for IIED because it "subjected [her] to severe and pervasive race discrimination, harassment and retaliation," including by "saddling her with significantly more responsibility and work" than non-African American employees, "failing to adequately onboard and train her, fostering a hostile work environment, fabricating performance issues," failing to investigate her complaints, "terminating her because of her race and in

14

retaliation for her engagement in protected activity," "failing to pay all earned wages to her upon termination," ECF 8, ¶ 192, and assigning her to work in a racially hostile market, *id.* ¶ 20. Aledade argues that these allegations fail to state an IIED claim. The Court agrees.

"Four elements must be sufficiently pled to state a claim for relief under IIED" under Maryland law: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." *Takacs v. Fiore*, 473 F. Supp. 2d 647, 651–52 (D. Md. 2007) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). Maryland courts have "cautioned that liability for the tort of IIED should be imposed sparingly and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" *Haines v. Vogel*, 249 A.3d 151, 163 (Md. Ct. Spec. App. 2021) (quoting *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991)). For conduct to be "extreme and outrageous," it "must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986)). "Liability does not exten[d] to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Chambers v. Sheppard Pratt Health Sys.*, No. SAG-24-2316, 2025 WL 1237358, at *8 (D. Md. Apr. 29, 2025) (quoting *Harris*, 380 A.2d at 614). IIED claims are so rarely viable that, as of 2021, "[a] claim for IIED ha[d] been sustained in Maryland [only] four times." *Haines*, 249 A.3d at 163.

Dr. Nwankpah fails to meet this high standard. She alleges that she was given more responsibility than white employees, denied appropriate training, subjected to unfounded accusations about her job performance, ignored when she complained about discrimination, deprived of earned compensation, forced to work in a racially hostile market, and subjected to

15

retaliatory termination and a hostile work environment. These are serious allegations of misconduct, but they do not rise to the level of IIED. "As inappropriate and repulsive as workplace harassment is, such execrable behavior almost never rises to the level of outrageousness" necessary to satisfy the second element of an IIED claim. *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002). Dr. Nwankpah's allegations are unfortunately common in workplace discrimination cases, and they mirror allegations that judges of this district have previously held insufficient to state an IIED claim. *See, e.g.*, *Wimbush v. Kaiser Found. Health Plan of the Mid Atl. States, Inc.*, No. TDC-14-525, 2015 WL 2090654, at *9 (D. Md. May 4, 2015) (allegations that, among other things, plaintiff was "treated . . . inappropriately or unfairly because of her race," including by being given worse shifts and less feedback than white employees, and by being "fired for supporting a fellow employee's discrimination complaint"; and that plaintiff was denied leave to care for her son, were insufficiently outrageous to state an IIED claim); *Colfield v. Safeway Inc.*, No. WDQ-12-3544, 2013 WL 5308278, at *9 (D. Md. Sept. 19, 2013) (being "unjustly terminated for 'alleged workplace violence,' suspended . . . for extended periods of time without pay," and falsely accused of "assault[ing] a co-worker" were "not the extreme and outrageous conduct required to state a claim for IIED"); *Murphy v. Republic Nat'l Distrib. Co., LLC.*, No. JFM-13-2758, 2014 WL 4406880, at *7 (D. Md. Sept. 5, 2014) (allegations that supervisor "routinely subjected [plaintiff] to derogatory comments about his age," "permitted other workers to circulate pornography and explicit photographs in front of . . . female employees, . . . refused to stop his allegedly unethical sales practices after he was confronted with an internal complaint" and caused the plaintiff's "physical, mental and emotional well-being [to] suffer[ ]" were not outrageous enough to clear the high bar for IIED claims). Dr. Nwankpah thus fails to

plausibly allege sufficiently extreme or outrageous conduct that would satisfy the second element of an IIED claim.

Count XI is dismissed without prejudice.

E.  **Section 1981a Claim (Count XII)**

Dr. Nwankpah also purports to bring a claim against Aledade for a violation of 42 U.S.C. § 1981a. Aledade argues that Dr. Nwankpah cannot state a claim under this statute because § 1981a does not create a cause of action. The Court agrees.

Section 1981a authorizes Title VII plaintiffs to recover "compensatory and punitive damages awards . . . [in] cases of 'intentional discrimination'" and requires plaintiffs seeking punitive damages to "demonstrate[ ] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (emphasis omitted) (quoting 42 U.S.C. §§ 1981a(a)(1), (b)(1)). In other words, the statute "provides additional remedies for plaintiffs who can otherwise show violations of Title VII." *McGraw v. Nutter*, No. DKC-20-265, 2020 WL 7425308, at *2 (D. Md. Dec. 18, 2020) (quoting *Pollard v. Wawa Food Mkt.*, 366 F. Supp. 2d 247, 251 (E.D. Pa. 2005)). "Section 1981a does not give rise to an independent cause of action." *Sledge v. Liuna Loc. 11*, No. DKC-20-3384, 2022 WL 616826, at *2 n.4 (D. Md. Mar. 2, 2022); *see also, e.g.*, *McGraw*, 2020 WL 7425308, at *2; *Torres v. B&L Mach. & Fabrication, Inc.*, No. 2:23-cv-318, 2025 WL 802993, at *6 (E.D. Va. Feb. 12, 2025), *aff'd*, No. 25-1236, 2025 WL 1513623 (4th Cir. May 28, 2025); *Moss v. Pasquotank Cnty.*, No. 2:10-CV-56-BR, 2012 WL 2325846, at *4 (E.D.N.C. Jun. 19, 2012); *Honerkamp v. Charlotte-Mecklenburg Hosp. Auth.*, No. 1:21cv218, 2021 WL 3475679, at *5 (M.D.N.C. Aug. 6, 2021). Because § 1981a does not create a cause of action, Dr. Nwankpah's claim under that statute must

be dismissed with prejudice.[4] Dr. Nwankpah nonetheless may seek the remedies available under § 1981a in conjunction with her Title VII claim (Count II).

Count XII is dismissed with prejudice.

### IV.   Conclusion

Aledade's motion to dismiss is granted in part and denied in part. A separate Order follows.

Date: December 12, 2025

Deborah L. Boardman
United States District Judge

---

[4] In her opposition, Dr. Nwankpah argues that "[c]ontrary to [Aledade's] representations, *42 U.S.C. § 1981(a)* does, in fact, authorize an independent cause of action for discrimination and retaliation claims." ECF 24, at 13 (emphasis added). This argument is nonresponsive. Count XII asserts a violation of § 1981a, not § 1981(a). Dr. Nwankpah does not explain how the former statute creates an independent cause of action. Aledade does not move to dismiss Dr. Nwankpah's § 1981 claim (Count I).